IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **M.T., individually and on behalf of N.T, a child with a disability.** | : : : : | |
| *Plaintiffs*, | : : | **Case No.**  2:26-cv-04617 |
| **v.** | : : : | |
| **SCHOOL DISTRICT OF PHILADELPHIA** | : : | |
| *Defendant*. | : : | |

## COMPLAINT

N.T., a near straight-A student with perfect attendance and an emphatic letter of recommendation from his middle school, was denied equal access to the School District of Philadelphia's 9th grade, magnet high school entrance lottery solely because he has a language-based learning disability.  Ignoring his individual talents, grit and history of success, the District has conveyed to him, in no uncertain terms: You are not smart enough to attend our magnet schools.

1.  N.T. is a 13-year-old student residing with his mother, M.T., in the City of Philadelphia, which is geographically coextensive with the area served by Defendant, the School District of Philadelphia (District).

2.  N.T. is a qualified individual with a disability as defined by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*. and § 504 the Rehabilitation Act of 1973 (§ 504), 29 U.S.C. § 794.

3. N.T. has been diagnosed as having a specific learning disability in reading, which falls under the definition of a mental impairment that substantially limits the major life activities of learning, reading and writing.

4. The District is a "recipient" of federal funding, required to comply with § 504.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action as it presents federal questions arising under the ADA and § 504. 28 U.S.C. § 1331.

6. This Court has supplemental jurisdiction over Plaintiffs' claims under Chapter 15 of the Pennsylvania Education Code, which are so related to the federal claims asserted that they form part of the same case or controversy. 28 U.S.C. § 1367.

7. This federal district is the proper venue for this action, as all parties reside in or are geographically located in Philadelphia, Pennsylvania, which is in this district. 28 U.S.C. § 1391(b)

## BACKGROUND

8. N.T. is a happy, diligent student who recently completed the 8th grade at Independence Charter School (ICS) in Philadelphia, PA.

9. Throughout his time at ICS, N.T. had near perfect attendance and got excellent grades. ICS teachers and staff uniformly praise his grit, as he succeeded despite having a language-based learning disability.

10. ICS educates students only through 8th grade. So, at the beginning of the 2025-2026 school year, N.T. and M.T. began the process – specific to the School District of Philadelphia – for applying to different District high schools, including criteria-based or magnet schools.

11. The District educates approximately 200,000 students, tens of thousands of whom have documented disabilities.

12. Many of these children, like N.T., have Individualized Educational Programs (IEPs) created under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq*. and/or § 504 Plans.

13. The District is home to several dozen high schools.

14. Among these high schools are twenty-two criteria-based high schools, which the District's website lists as follows, along with the specific admissions criteria each school applies for students seeking to enroll for ninth grade:

| School Selection Criteria : Criteria | | | | | |
|---|---|---|---|---|---|
| **HIGH SCHOOLS** | Central High School<br><br>Julia R. Masterman High School | Academy at Palumbo High School<br><br>George Washington Carver HS of Engineering and Science<br><br>Parkway Center City Middle College<br><br>Northeast Medical, Engineering and Aerospace Magnet<br><br>Northeast Pre-International Baccalaureate Diploma Program | William W. Bodine H.S. for International Affairs<br><br>George Washington International Baccalaureate Diploma Program<br><br>Science Leadership Academy (SLA)<br><br>Science Leadership Academy (SLA) – Beeber Campus<br><br>Girard Academic Music Program (GAMP)<br><br>Creative and Performing Arts High School (CAPA) | Arts Academy at Benjamin Rush<br><br>Franklin Learning Center (FLC) High School<br><br>Hill-Freedman World Academy School<br><br>Lankenau Environmental Science Magnet<br><br>Philadelphia High School for Girls | Motivation High School<br><br>Parkway Northwest HS for Peace and Social Justice<br><br>Parkway West High School<br><br>Walter B. Saul HS of Agricultural Sciences |
| **Grade Requirements** | As and Bs | As and Bs | As, Bs and one C | As, Bs and two Cs | As, Bs, and Cs |
| **Attendance** | 95% | 95% | 90% | 90% | 90% |
| **Assessment** | 80th Percentile for ELA & Math | 65th Percentile for ELA & Math | 50th Percentile for ELA & Math | 50th Percentile for ELA or Math | 50th Percentile for ELA or Math |
| **Additional Requirements** | **Masterman** - Algebra I | None | **SLA** - Individual project-based presentation<br>**SLA Beeber** - Individual project-based presentation<br>**GAMP** - Audition<br>**CAPA** - Audition | **Rush** - Audition<br>**FLC** - Audition or portfolio presentation | None |

15. As the table indicates, these schools are selective, imposing grade and attendance requirements on applicants.

16. These schools also require applicants to attain scores of at least the 50th percentile (or higher for several schools) on the English Language and/or Math components of the Pennsylvania System of School Assessment (PSSA), a standardized test administered to students in grades 3-8 in public schools across Pennsylvania.

3

17. Because there are more ninth grade students in the District than spots available at these magnet schools, the District conducts annual selection lotteries for incoming ninth graders seeking to enroll at these schools.

18. The District describes the lotteries as using "a Nobel Prize winning Deferred Acceptance algorithm, otherwise known as a ranked based lottery." The stated goal is to allocate scarce resources equitably without risk that certain families can game the system.

19. Children with IEPs often fail to meet mandatory admissions criteria to magnet schools – especially the PSSA scoring thresholds. Historically, this meant that they were systematically excluded from the schools' selection lotteries.

20. On May 16, 1995, to settle class litigation about discrimination against children with disabilities who sought to apply to these schools, the District entered into a consent decree (the *LeGare* decree)[1] under which it was required to do an "impartial review" of qualifications for students with IEPs and "504 plans" or English-language learners.

21. The *LeGare* decree did not alter or expand students' rights under existing federal law; rather, it established a process the District had to follow to comply with federal law.

22. The *LeGare* decree laid out processes to ensure fairness for student with disabilities. It required the District to "take all necessary action" to ensure:

  a. Each student with disabilities has an **equal opportunity to participate** in the high schools and high school programs that are available to students generally.

  b. Each student with disabilities and his or her family receives **timely information and guidance** concerning the full range of high schools and high school programs that are available within the District; the procedures for obtaining admission; and the nature of the accommodations and supports that will be made available, within these schools and programs, for students with disabilities.

---

[1] *Lamar LeGare v. Sch. Dist. of Phila.*, No. 94-CV-4243 (E.D. Pa.) (Bartle, J). The *Legare* decree is attached to this complaint as Exhibit A.

c.  Each student with disabilities is afforded the right to **reasonable accommodations** within all high schools and high school programs. These accommodations may include special education support services, if these services can be provided to the student **without substantially altering the nature of the program in question**.

d.  Each student with disabilities has an **equal opportunity** to participate in, and obtain the educational benefits of, a small learning community [SLC]. This includes the right to a range of choices among SLCs that is reasonably comparable to the range of choices offered to students without disabilities, and the right to be included with non-disabled peers to the maximum extent appropriate.

e.  With respect to any high school or high school program that imposes admission criteria related to ability, school performance, attendance or behavior, **a student with disabilities is not excluded** on the basis of those criteria unless:

   (i)  The **criteria are essential** to successful participation in the school or program, and alternative criteria that do not disproportionately exclude students with disabilities are unavailable; and

   (ii)  **Even if reasonable accommodations were made** for the student within the school or program, **the student could not participate in it successfully**.

f.  All decisions concerning the accommodations and supports needed by a student with disabilities are made by a **team of knowledgeable persons**, on the basis of a multidisciplinary **evaluation of the student's needs and abilities**.

23. The District appears to have revised its *LeGare* procedures and established a superseding *Individualized Review* process.

24. Under the current Individualized Review process, qualified students with disabilities may waive one admission criterion when they wish to apply to a criterion-based school.

25. The District's current website explains:

The Individualized Review is a process that expands upon what was formerly known as the *LeGare* Impartial Review. The Individualized Review occurs when a student is applying to the entry grade level of a criteria-based middle or high school program.

This process allows certain qualified students the opportunity to waive one (1) criteria [sic] in order for the Individualized Review team to determine eligibility for the criteria-based school(s).

The Individualized Review is the appeal process for students who do not meet one

eligibility requirement to determine, for each criteria-based school, whether the student can access the curriculum at that school with reasonable accommodations.

26. According to a Q&A page on the District's website, there is an Individualized Review Team (IRT) that assesses the applications of students seeking a waiver of criteria. It states:

- The Individualized Review team looks at the student as a whole, and
- Reviews the IEP/504/EL [English learner] supports the school(s) can provide.
- Reviews the student's required IEP/504/EL supports and demonstrated academic growth.
- Reviews the waiver request and supporting documentation.
- The team is looking to see if the student can be successful at the program they are applying to.[2]

27. Although the District's rules are confusing, the bottom line is that a student with an IEP, like N.T., can apply to the lotteries for magnet schools if he or she meets two of the schools' three admissions criteria, seeks a waiver of the criterion he or she cannot meet, and receives District approval to apply for the lottery.

28. The process failed N.T. here.

29. Despite the evidence strongly supporting N.T.'s ability to succeed at any of the five magnet high schools whose lotteries he applied to, the District denied him the opportunity to participate in those lotteries.

30. By way of additional background, ICS and other charter schools coordinate with the District to help their students participate in the District's high schools and enter their lotteries.

31. Specifically, ICS provides counseling and support for students, like N.T., who have IEPs and need waivers of an admissions criterion.

32. ICS records show that N.T. excelled academically at ICS.

33. He received nearly straight As and had perfect attendance.

---

[2] https://www.philasd.org/studentplacement/school-selection/#legare (visited July 2, 2026).

34. In 2025, N.T. scored in the 43rd percentile on the ELA portion of the PSSA – just below the 50th percentile cut-off for two of the schools he applied to (Bodine and Science Leadership Academy).

35. On September 30, 2025, James McGonagle, ICS's Special Education Case Manager, wrote a recommendation letter explaining why the District should waive N.T.'s ELA PSSA score and allow N.T. to participate in all five magnet school lotteries.

36. McGonagle wrote:

Dear Admissions Department,

It is with pleasure that I am writing this letter of support on behalf of N.T. to further explain why his ELA PSSA scores should not be considered as part of the high school application. N.T.'s specific learning disability (SLD) is in reading. Please note that he did score proficient (82 percentile!) in math, where he does not have a disability.

N.T. is a very kind and motivated 8th grade student at Independence Charter School. I am the 8th grade special education case manager and oversee all of N.T.'s evaluations, IEP meetings/revisions, related services, progress monitoring, etc.

N.T. has been working on developing his reading and writing skills both in the general education setting and within the learning support classroom. He has made great progress and continues to grow each and every day.

N.T.'s ELA PSSAs should not be considered as part of his application for many reasons including but not limited to the following:

1. N.T.'s primary disability category of SLD in reading inhibits his ability to demonstrate his knowledge on a traditional, grade level assessment. At ICS, we understand and value that skill achievement and progress can be measured through verbal and/or visual modalities, which may provide a more accurate gauge of N.T.'s understanding. For instance, N.T. earned an A in his regular education ELA class.

2. Although N.T. has demonstrated significant efforts as evidenced by his reevaluation reports and IEP yearly progress, the ELA PSSA score fails to display how N.T. has increased his reading abilities by four grade levels in just two years.

3. The ELA PSSA can be an accurate way for measuring ELA mastery for those who are already accessing 8th grade level content; however, N.T. and many other students are discouraged by the difficulty of test items and overall length of the testing sessions inhibiting their potential to fully demonstrate their skills.

7

4. N.T. has displayed consistency in his academics, earning all A's and one B+ over the past two years and having 100% attendance. This shows how responsible N.T. is for his education and how he displays his best efforts every day.

As part of the Individualized Review process, we have chosen to ask that you waive N.T.'s ELA PSSA scores as we do not feel as though this is a true representation of his academic ability. I know that N.T. will continue to apply the same high level of work in high school coursework as he did in middle school. Overall, N.T. is a curious and respectful scholar. I have no doubt that he would make a great addition to your high school freshman class.

Please reach out to me if you have any questions,

James McGonagle

37. With ICS's support, N.T. applied to participate in the 2025-26 lotteries for five criterion-based high schools:

- Academy at Palumbo
- Bodine High School
- Central High School
- Parkway Center City Middle College High School
- Science Leadership Academy (SLA)

38. Having seen N.T.'s success first-hand, McGonagle and his fellow ICS teachers and staff believe *with certainty* that N.T. can succeed at all five of these schools.

**The District Unlawfully Denies N.T. Access to its Magnet School Lotteries**

39. In October 2025, M.T. contacted knowledgeable individuals at several of the schools that N.T. hoped to apply to and was assured that they had robust special education programming available. Based on the schools' responses, M.T. believed they could accommodate N.T.

40. For example, on October 9, 2025, she emailed Shana McClendon, the Special Education Compliance Manager at Parkway Center City Middle College, requesting information about its Special Education programming:

Hello Ms Mclendon,

I hope this message finds you well. My name is [M.T.], and I'm the parent of [N.T.], who is interested in applying to Parkway Center City Middle College for next school year.

[N.T.] currently has an IEP and will be applying through the Individualized Review process. He's a dedicated student with all A's, perfect attendance, and strong motivation to excel. We're very excited about the opportunities Parkway offers and want to ensure that we follow the correct steps to support his application.

Could you please share a bit about how Parkway supports students with IEPs and whether there's any additional documentation or process we should complete for his application?

Thank you so much for your time and for the support you provide to families. I really appreciate any guidance you can offer.

Warmest Regards,
[M.T.]


41. On October 22, 2025, Ms. McClendon replied:

Good morning Mrs. [T],

I hope this email finds you well.

I would like to sincerely apologize for my delay in responding to this email, and hopefully, it is not too late to answer any questions you have in regard to [N.T.] and potentially attending Parkway.

To start and based on the email you sent, [N.T.'s] grades and attendance meet the criteria for Parkway (students meet the criteria as long as they have A's, B's, and are only allowed one C). Most students with an IEP who attend Parkway usually are at the itinerant level of support (meaning they would receive most of their instruction within the general education classroom, receive push-in support from their special education teacher, and may be pulled out for small group testing as well as to support in the areas of executive functioning if needed). Parkway has rigorous programming, as I'm sure you're aware that students are earning their high school diploma and an Associate's Degree within four years. Most of their high school courses are completed within students' 9th and 10th grade years. With that being said, some students can become overwhelmed in their first year, but most students adjust and find their "footing" and fare well.

As far as support from the college, if [N.T.] chooses to do so, I would help him to submit his IEP and most recent evaluation to the Center On Disabilities at the Community College of Philadelphia. The COD would review those documents to

determine if he is eligible for any accommodations under the Americans with Disabilities Act (ADA). In most cases, students qualify for extended time on assessments, small group testing at the COD testing center, and preferential seating. There are some other accommodations that the college provides, but it depends on the student's needs.

Lastly, as far as additional paperwork, please make sure that [N.T.'s] IEP was uploaded along with any other documentation that was required per the high school selection process.

If you have further questions or concerns, please feel free to reach out to me. Again, my apologies for the delayed response.

Best,
Shana McLendon

42. On October 23, 2025, in response to a similar letter from M.T., Betsy Lipschutz, the Special Education Compliance Monitor for the Academy at Palumbo, wrote:

Good morning Ms. [T],

Your email to Ms. DeNaples was forwarded to me. I am the SPECM at Academy at Palumbo. Here is information about our special education program.

Thank you for your interest in Academy at Palumbo for your student. It truly is a wonderful school. We have five special education teachers on staff this school year who work with students that receive special education services in grades 9 through 12. Palumbo follows an inclusion model with students receiving services inside of the general education classroom. For our 9th and 10 grade students, math and reading classes are co-taught with both a general education and a special education teacher in the classroom. For 11th and 12th grade students, special education teachers push into reading, math and math classes. They may also push into other classes as well. We have a staffed resource room where students can take tests and quizzes in a smaller setting, receive help on assignments, or have a quiet place to work. Please let me know if you have any questions.

Thank you,
Betsy Lipschutz

43. These responses strongly suggested that N.T. could access the curricula with the reading supports offered at either school.

44. The only distinction between the reading support N.T. was receiving at ICS and what Palumbo and Parkway Center City would apparently provide was that, at ICS, N.T. got "pull-out" reading instruction in a resource room, while at Palumbo or Parkway Center City, reading support would *likely* be provided as "push-in" instruction from a special education teacher – although according to Ms. McLendon, this was "usually" but not always the case at Parkway. Both Palumbo and Parkway Center had resource rooms for testing, help on assignments, quiet time, and/or supplemental instruction.

45. Unfortunately, the District denied N.T. permission to participate in the lottery for all five schools.

46. On December 8, 2025, the District purported to conduct an individualized review of N.T.'s waiver application.

47. The District's internal documents, which were not shared with N.T. or his mother M.T., listed all five of N.T.'s magnet school choices and offered the following response for each school: "**Denied. Rationale if Denied [Choice #__] The school/program cannot meet the applicant's educational needs.**"

48. M.T. learned that the District had rejected N.T.'s lottery applications when she logged onto its parent portal and saw each school marked as "ineligible for lottery":



49. The District provided no other written evidence of its purported individualized review of N.T.'s qualification to attend these schools.

50. On December 16 and 17, 2025, seeking further clarification, M.T. emailed the District "requesting clarification on the specific reason(s) or codes used for this determination and confirmation of which application materials were reviewed (grades, attendance, IEP, recommendations, etc.)."

51. On December 17, 2025, M.T. received a response from the IRT that had no additional information about why it rejected N.T. for all five schools:

> In some cases, the individualized review team determines that a student would require a higher level of support than the school is able to provide within its general education curriculum, even with reasonable accommodations. When this occurs, an ineligible status is issued.

52. M.T. responded on the same day requesting that the District –

please clarify which specific IEP service(s) or level(s) of support were determined to exceed what is available within the general education setting at criteria-based

schools? We would like to ensure the determination was based on N.T.'s current IEP as written, and not on assumptions regarding anticipated needs.

53. On December 18, 2025, the IRT responded, again with no specific information about its decision to reject N.T.'s application:

The Individualized Review Team looks at the student's current IEP as written, along with all supporting documentation submitted, to determine whether the student can access and participate in the school's general education program with reasonable accommodations. The review is not based on assumptions about what a student might need in the future, but rather on the services, supports, and instructional setting outlined in the current IEP.

Because the review considers the overall level and intensity of support, rather than evaluating or scoring individual IEP services one by one, the team does not issue decisions tied to specific services or accommodations. For that reason, we are not able to provide a breakdown of which particular IEP components led to the determination.

54. The District's explanation was a non-explanation. It would not explain its determination that none of the five schools could specifically accommodate N.T.  To the contrary, it represented that it did not – indeed could not – specify individualized accommodations for N.T. that were reasonable or unreasonable for it to provide under the ADA/§ 504 (*i.e.*, would or would not fundamentally alter the nature of the five schools).

55. On February 25, 2026, M.T. emailed the District:

I am again formally requesting: - A written explanation of the specific reason(s) for ineligibility - Confirmation of all materials reviewed, including the IEP waiver submitted by school staff - The policy, rubric, or guidelines governing Individualized Review evaluations.

56. The District did not provide M.T. any policy, rubric or guidelines, suggesting that there are none.

57. Instead, on February 26, 2026 the District sent M.T. another nonexplanation "on behalf of the Chief of Special Education and Diverse Learners":

13

The Individualized Review Team looks holistically at students who do not meet all of the criteria for a criteria-based school to determine if the student can be successful in the general education program with reasonable accommodations and modifications.

We have reviewed N.T.'s file as part of the Individual Review process and again as a result of this request. The criteria-based schools to which N.T. applied cannot be modified to meet his educational needs without fundamentally altering the nature of the schools' program.  In addition to the minutes of support required in his IEP, this decision was made in review of N.T.'s Present Levels of Academic Achievement and Functional Performance in his IEP and supporting documentation for the PSSA waiver provided in the application.

58. In March 2026, M.T. requested a meeting with District leadership to clarify:

- Which elements of N.T.'s IEP were determined to require modification of the program.
- How the determination was made that reasonable accommodations could not be implemented without fundamentally altering the respective programs.
- Whether the review considered alternative ways the services outlined in his IEP could be implemented within those school environments.

59. On March 6, 2026, Dr. Nathalie M. Nérée, the District's Chief of Special Education and Diverse Learners, met virtually with M.T.  Nérée repeated the District's deflection – which could apply to any child with an IEP – that the IRT evaluates the overall intensity of support in a student's IEP rather than analyzing individual services. She added that the District does not give parents specific details about which aspects of an IEP result in a determination of ineligibility, without saying why it had a policy of withholding that salient information.

60. The District's responses imply that it failed to take steps necessary to look at N.T. individually and assess what individualized supports he would need to attend any (let alone all five) of the schools he applied to, or determine whether and how those supports would fundamentally alter any or all of the schools' programs. Its explanation would apply to any child with a reading deficit like N.T.'s.

61. The District's reference to "support available in the schools to which he applies," coupled with the five-times-repeated boilerplate – **The school/program cannot meet the**

14

**applicant's educational needs** – supports an inference that the District did not actually do an individualized review in compliance with its stated policies, or with the ADA/504 and Chapter 15.

62. Moreover, the District does not appear to have considered Mr. McGonagle's endorsement of N.T. – specifically, his history of dramatic improvement in reading skill, exemplary attendance and grades, and tremendous work ethic, all of which let him excel at ICS despite his learning obstacles.

63. ICS teachers and staff believe that N.T. is better qualified than many of his non-disabled peers to attend the magnet schools in question.

64. ICS teachers and staff confirm that N.T. would be able to access the curricula of, and succeed at, any of the five magnet schools with straightforward accommodations that schools routinely offer to children with language-based learning disabilities like dyslexia (*i.e.*, extra time for assignments, extra time for assessments, audio books, etc.).

65. The District's non-individualized responses strongly imply that it did not conscientiously analyze whether any of the five magnet schools to which N.T. applied could provide him with routine accommodations without fundamentally altering their respective programs. Had the District conscientiously reviewed N.T.'s file, it would have realized that he would be able to succeed – indeed excel – at any of the five schools to which he applied.

66. The District's non-individualized responses to M.T.'s inquiries strongly imply that its personnel are not adequately trained to do (or supervised in doing) individualized analyses of students, like N.T., who seek waivers of admission criteria.

67. The District's non-individualized responses strongly imply that it denied N.T. equal access to its high school lottery system solely on the basis of his disability classification.

15

68. The District's non-individualized responses also demonstrate a *de facto* policy or practice of denying children, like N.T., with language-based learning disabilities, access to (at least) the five magnet schools in question. In other words, the District's individualized reviews are predetermined and perfunctory.

## COUNT I

**Americans with Disabilities Act**
**Section 504 of the Rehabilitation Act**
**Chapter 15 of the PA Education Code**
**Preliminary and Permanent Injunctive Relief**

69. Plaintiffs re-allege paragraphs 1 through 68 above.

70. Defendant is a "recipient" of federal funding and is therefore required to comply with § 504.

71. Solely due to his disability, N.T was excluded from the participation in, denied the benefits of, and subjected to discrimination under programs and activities administered by the District, all in violation of § 504 and the ADA.

72. To obtain a preliminary injunction, Plaintiffs must show a likelihood of success on the merits, a likelihood of irreparable harm to them in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest.

73. To obtain a permanent injunction, Plaintiffs must show success on the merits, a irreparable harm to them in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest.

74. Plaintiffs satisfy all four requirements for a preliminary and permanent injunction.

75. Plaintiffs have a high likelihood of success on the merits of their claim.

76. The District expressly excluded N.T. from participating in its school selection lottery because it deemed, without individualized analysis, that it could not provide accommodations for him at any of the five magnet schools to which he applied.

77. The District did not consider individually whether any of these schools could offer N.T. reasonable accommodations that would allow him to attend successfully without fundamentally altering their respective programs. Rather, it excluded him from these schools' lotteries based on disability classification (and its misunderstanding of his individual skills and capabilities).

78. N.T. will suffer irreparable harm if he is not immediately admitted to one or several of the five selected schools for the Fall 2026. Because N.T. was not permitted to enter the Fall 2025 lotteries for these five schools, he was denied the chance to be admitted to any of them for Fall 2026.

79. There is no adequate remedy at law. For example, allowing N.T. to participate in the next year's lottery (Fall 2026) would not redress the harm, as N.T. would still be excluded from admission to all five schools for the entirety of his 9th grade 2026-2027 school year.

80. The District will suffer no harm if it admits N.T. to one or several of the five schools. There is no harm in ordering the District to comply with federal and state law.

81. An injunction is in the public interest because it will compel the District to comply with its duty under the ADA, § 504 and Chapter 15 not to discriminate against children with disabilities.

82. Wherefore, Plaintiffs seek both preliminary and permanent injunctions requiring the District to offer N.T. admission to any of the five magnet schools to which he sought to apply.

## COUNT II
### Attorneys' Fees

83. Plaintiffs re-allege paragraphs 1 through 77 above.

84. If Plaintiffs achieve success in this action under the ADA and/or § 504, and alters the legal relationship between themselves and their opponent, they will be "prevailing parties."

85. Under both the ADA and § 504, prevailing parties are entitled to reasonable attorneys' fees, as well as their costs, expenses and pre- and post-judgment interest.

86. Plaintiffs will be further entitled to reasonable fees and costs for additional time expended and costs incurred in seeking attorneys' fees in this federal action.

87. Wherefore, Plaintiffs respectfully request that the Court award them reasonable attorneys' fees, costs, expenses and pre- and post-judgment interest.

Dated: July 2, 2026                                  Respectfully Submitted,

_____
Benjamin J. Hinerfeld
David B. Lapp
Law Office of Benjamin J. Hinerfeld
1528 Walnut Street, Suite 1100
Philadelphia, PA 19102
9 Stoddard Street
Plymouth, MA 02360
Ben@Hinerfeldlaw.com
Tel: (215) 694-7432
Fax: (215) 689-2423